The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Shuping. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following: Prior to hearing, the parties entered into a Pre-Trial Agreement, which is hereby incorporated by reference as if fully set-out herein and where they agreed to a number of jurisdictional and other factual stipulations, including the stipulated medical records and the statements of contention.
 ***********
Based upon the Findings of Fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a 46-year-old married female, who has a two-year Associates Degree in Nursing and is a Registered Nurse.
2. Prior to graduating from high school and one of her jobs was waitressing. In 1972 or 1973 she became employed at Dorothea Dix Hospital and worked there 12 or 13 years as a health care technician and/or behavioral therapist until deciding to enter nursing school in 1983. After obtaining her nursing degree plaintiff returned to work at Dorothea Dix Hospital in her former capacities, but left after eight months because she wanted to do more psychiatric teaching rather than primarily writing restraint orders.
3. On February 2, 1987, defendant-employer employed plaintiff as a staff nurse assigned to one of its bloodmobiles responsible for drawing blood from between 25 and 250 blood donors daily. She worked five or six days a week, at least 38 to 40 hours a week, and occasionally up to 50 hours per week.
4. In approximately March of 1988, and as part of her assigned ordinary employment duties as a staff nurse assigned to one of defendant-employer's bloodmobiles, plaintiff used a needle to transfer a donor's blood into a glass sample tube with a rubber stopper for testing. In the process, she suffered a needle stick through the pad of her left index finger into the adjacent middle finger due to a break in the glass sample tube.
5. Plaintiff's claim is for disabling hepatitis C due to her exposure to contaminated blood in the course of her employment as a registered nurse who drew blood for one of defendant-employer's bloodmobiles. Hepatitis C is a disease characteristic of and peculiar to plaintiff's employment, trade, or occupation as a health care worker, when compared to members of the general public and other employment at large.
6. Hepatitis C is a blood borne virus or pathogen primarily transmitted by blood contact, illicit drug use and from mother to child. In health care workers such as plaintiff, needle sticks primarily transmit the virus. Other than her potential exposure to contaminated blood as a health care worker for defendant-employer, plaintiff has no other known risk factors for developing hepatitis C. She has been married to the same man since 1993 and enjoys a monogamous relationship. She has never received a blood transfusion, used illicit drugs, or had any other potential risk exposure to hepatitis C.
7. The disease primarily affects the liver with the hallmark of elevated liver enzymes. Until the late 1980's or early 1990's, there were no available tests for hepatitis C. Current tests do not test positive for an infection until anywhere from 12 weeks to six months after a potential exposure to contaminated blood. The initial infection is generally asymptomatic. However, 10 to 30 percent of the time, symptoms manifest by low-grade intermittent episodes of nausea and diarrhea with myalgias and pruritus, fevers, chills and abdominal pain, which plaintiff has experienced since late 1988 or early 1989. Infectious disease specialists such as Dr. Weber are primarily interested in the transmission and prevention issues. Gastroenterologists, such as Dr. Pierson, ordinarily handle the management and treatment of both acute and chronic, hepatitis C. For this reason, Dr. Pierson's opinion regarding whether the intermittent low-grade symptoms that plaintiff has experienced since late 1988 or early 1989 are the result of a chronic hepatitis C infection is given more weight than Dr. Weber's testimony, which indicated that symptoms only ordinarily lasted from a week or two to approximately three or four months.
8. Eighty-five percent of the people that develop hepatitis C become chronically infected, as has plaintiff. She remained a carrier at the time Dr. Pierson initially saw her in 1993, five years following the needle stick through which she contracted the virus. Of those who survive 10 to 20 years and do not die from other causes, there is a 60 to 80 percent risk they will develop chronic liver disease with dire consequences such as hepatoma (liver cancer) or cirrhosis of the liver with associated liver failure resulting in the need for a liver transplant. The only available treatment for hepatitis C is interferon therapy. However, it is successful only 30 to 50 percent of the time, has significant side effects, and costs $200,000.
9. Due to her exposure to contaminated blood from a needle stick in the course of her employment as a registered nurse while drawing blood in approximately March of 1988, plaintiff has developed disabling hepatitis C. Plaintiff's intermittent low-grade symptoms, manifested as low-grade fever, abdominal pain, nausea, chronic diarrhea, myalgias and pruritus that began later that year or early the next one, have continued to date.
10. Plaintiff immediately notified defendant-employer of the needle stick and a written incident report was prepared. Pursuant to defendant-employer's protocol when one of its health care workers suffered a needle stick or was otherwise exposed to potentially contaminated blood, plaintiff s blood and that of the particular donor were tested for hepatitis A B as well as the HIV virus, which were negative. There was no test available for hepatitis C at that time.
11. After she began experiencing the above-described intermittent low-grade symptoms from her hepatitis C, plaintiff sought medical treatment from her family physicians who were never able to diagnose the cause or effectively treat the her symptoms. Rather, they merely provided palliative or symptomatic treatment, which did not alleviate them. During this period of time, plaintiff was also experiencing other unrelated health problems of both an acute and chronic nature, which are described in the stipulated medical records of her family physicians. They included an ankle fracture, knee and hand problems (carpal tunnel syndrome) requiring surgery, and cervical spasm and pain. Those problems along with the chronic low-grade symptoms that she was continuing to experience from her then undiagnosed hepatitis C contributed in significant, but indeterminate part, to the general decline in plaintiff's health.
12. Due to the general decline in her health, and the fact that her family physicians were unable to diagnose or effectively treat the continued chronic low-grade hepatitis C symptoms, plaintiff, who had a prior history of depression, again became depressed. She had associated problems with stress and anxiety for which she sought psychiatric treatment from Dr. Sheldon Chance, who ultimately recommended that she only work on a part-time basis to reduce her stress. Plaintiff began experiencing problems with absenteeism at work attributable to the general decline in her health.
Consequently, defendant-employer gave plaintiff an option of either being terminated from its employ or accepting a per diem position as a pheresis nurse at the same hourly rate responsible for preparation of blood platelets for cancer patients. This involved working a minimum of twenty hours a week rather than the 38 to 40, and occasionally up to 50 hours, she worked a week when assigned to the bloodmobile.
13. Plaintiff accepted the per diem position as a pheresis nurse. On or about December 12, 1989, she returned to work in that capacity. She was initially only able to work 16 hours a week, but subsequently increased her hours to 24 and then 32 hours a week. Ultimately plaintiff was forced to reduce her hours back to 24 because the more she worked, the more it adversely affected her chronic medical problems and her declining health.
14. The diminution in plaintiff's wage earning capacity after she was forced to accept the per diem job and work less than full time was due in significant part to the chronic intermittent low-grade symptoms that she experienced from hepatitis C. This contributed to the general decline in her health and secondary emotional or psychological problems attributable to it. These facts entitle plaintiff to compensation for the resulting diminution in her wage earning capacity based on two-thirds of the difference between the average weekly wage she earned at the time of her injury in March 1988 and when she was forced to accept the per diem job as a pheresis nurse working fewer hours. The reduced average weekly wage plaintiff was able to earn as a pheresis nurse beginning December 12, 1989, and the specific amounts of compensation that plaintiff is due since December 12, 1989, cannot be determined in the absence of both a wage chart indicating her earnings as a staff nurse in the bloodmobile during the year prior to December 12, 1989, when she initially became disabled and the amount she has since been able to earn as a pheresis nurse.
15. While working as a pheresis nurse drawing blood to test for makers on May 25, 1993, plaintiff noticed that blood had somehow gotten under her protective glove and upon removing the glove noticed a scratch on her finger.
16. Plaintiff immediately notified defendant-employer of the same incident. According to defendant-employer's protocol for the potential exposure to contaminated blood, plaintiff again underwent blood testing, which this time included a test for hepatitis C that been developed since her prior needle stick in approximately March of 1988.
17. Approximately 17 days later, well outside the 12-week to six-month period for any testing to be positive had she been exposed to the hepatitis C virus on or about May 25, 1993, plaintiff received a conference call from the Regional Manager of Pheresis and her immediate supervisor. In the course of this meeting, plaintiff was advised that her blood sample taken on May 25, 1993 was positive for hepatitis C. That same day defendant-employer temporarily terminated plaintiff from its employ because she was suffering from hepatitis C and might risk contaminating its blood supply.
18. The following day plaintiff spoke by telephone with defendant-employer's Regional Medical Director, Dr. Haley, who advised her that hepatitis C could only be contracted through contact with blood. During the course of the same telephone conversation plaintiff advised Dr. Haley of the earlier needle stick she sustained in approximately March of 1988.
19. Although she initially became partially disabled by her hepatitis C on or about December 12, 1989, the disease was not diagnosed until June of 1993. Therefore, plaintiff could not have been advised earlier by competent medical authority of the nature and work-related consequences of this disease. Therefore, plaintiff had two years to file her occupational disease claim from the later of the date she either became disabled by her hepatitis C or was advised by competent medical authority of the work-related nature of her disability, which could not have occurred prior to the disease being diagnosed in June 1993. Plaintiff filed her claim less than a year later.
20. Plaintiff notified defendant-employer of the original needle stick responsible for her developing hepatitis C on the date that it happened, resulting in a written incident report and her undergoing blood tests, which did not then include one for hepatitis C. On May 25, 1993, plaintiff also notified defendant-employer of the second incident involving potential exposure to contaminated blood and underwent additional testing that ultimately resulted in diagnosis of her hepatitis C. As a result of the testing ordered as part of its protocol under the circumstances, defendant-employer was aware that plaintiff was suffering from hepatitis C — even before she was. On the date plaintiff was advised she was infected with hepatitis C by defendant-employer and that the condition could only be contracted by contact with blood, plaintiff notified defendant-employer's medical supervisor regarding the documented needle stick she had sustained in March 1988.
Under the foregoing circumstances defendant-employer was not prejudiced in either its ability to provide plaintiff with prompt, competent and continuing medical treatment for her hepatitis C, or to timely investigate the circumstances of her contracting the same disease. Plaintiff herself sought prompt, competent and continuing medical treatment when she began to experience the chronic intermittent low-grade symptoms of the disease. There is no pre- or post-exposure vaccine that could have prevented or cured plaintiff's hepatitis C. She not responsible for the fact that no physician was able to diagnose the disease until after a test became available in the 1990's and she finally was tested after the incident on May 25, 1993, at defendant-employer's request.
21. Two weeks after her temporary termination, defendant-employer again allowed plaintiff to return to work on a per diem basis, but in a job that involved taking medical histories and other administrative duties where there was no risk of her contaminating its blood supply.
22. As a per diem employee there was a minimum of 20 hours of work available for plaintiff, up to 30 hours had she been physically able to do so. However, due in significant, but indeterminate, part to her hepatitis C, plaintiff has only been able to work an average of eight to 14 hours.
23. The continued diminution in plaintiff's wage earning capacity after she returned to the job taking medical histories and performing other administrative duties, working only eight to 14 hours a week was due in significant part to the chronic intermittent low-grade symptoms that she experienced from her hepatitis C which contributed to the general decline in her health and secondary emotional or psychological problems. She is entitled to compensation for the resulting partial diminution in her wage earning capacity based on two-thirds of the difference between the average weekly wage she was able to earn at the time of her original injury on December 12, 1989, and the reduced average weekly wage she has been able to earn doing medical histories and other administrative work since July 1993. The specific amounts of compensation that plaintiff is due since July 1993 for her continuing partial incapacity cannot be determined in the absence of both the wage chart indicating her earnings as a staff nurse in the bloodmobile during the year prior to December 12, 1989, when she initially became disabled, and the amount she has been able to earn doing medical histories and other administrative work since July 1993.
24. After being advised by defendant-employer that she was suffering from hepatitis C, plaintiff returned to her family physician, Dr. DeLeon, who referred her to gastroenterologist, Dr. W. Pierson, who confirmed that the low-grade intermittent symptoms that plaintiff has experienced since the needle stick in 1988 were compatible with chronic hepatitis C.
25. At the time of consulting Dr. Pierson in 1993, five years following the date she contracted hepatitis C from the needle stick sustained in March 1988, plaintiff remained a carrier of the disease. She is not contagious through casual contact and probably not contagious through sexual contact; but potentially remains contagious through blood to blood contact. Because of the continuing risk that she will develop chronic liver disease with all its consequences, plaintiff needs to be regularly medically monitored to insure her condition does not worsen.
26. There is no evidence that plaintiff has suffered any type of permanent damage to her liver, which is indisputably an important internal organ. In fact in her testimony, plaintiff indicated that Dr. Pierson had told her that her liver was repairing itself and the liver tests that she has so far undergone have remained normal. Plaintiff, however, does remain at risk of developing chronic liver disease if she lives for 10 to 20 years beyond the date she contracted the hepatitis C in approximately March of 1988 and does not die from other causes. Should plaintiff develop chronic liver disease, she will undoubtedly require significant medical treatment, including a potential liver transplant.
 ***********
Based on the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Due to her exposure to contaminated blood from a needle-stick in the course of her employment as a staff nurse drawing blood on one of defendant-employer's bloodmobiles in approximately March 1988, plaintiff has developed disabling hepatitis C, which (disease) is characteristic of and peculiar to her same trade, occupation or employment, but excluding all ordinary diseases of life to which the public is equally exposed outside of that employment. Therefore, plaintiff has developed a compensable occupational disease pursuant to the provisions of N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's last, and only injurious, exposure to the hazards of the same disease occurred as a result of the needle stick she sustained in approximately March of 1988. N.C. Gen. Stat. § 97-57.
3. For the reasons stated in the above Findings of Fact plaintiff has complied with the notice provisions of N.C. Gen. Stat. § 97-58 and § 97-22.
4. For the reasons stated in the above Findings of Fact, plaintiff has timely filed her claim within two years of the latter of the dates she became disabled by the involved occupational disease or was notified by competent medical authority of the nature and work-related consequences of the same disease. N.C. Gen. Stat. § 97-58.
5. Due in significant, but indeterminate, part to the chronic intermittent low-grade symptoms that she has experienced from her hepatitis C that contributed to the general decline in her health and secondary emotional or psychological problems attributable to it, plaintiff has remained partially disabled by her hepatitis C since December 12, 1989, entitling her to compensation based on two-thirds of the difference between the average weekly wage she was able to earn as a staff nurse on December 12, 1989, when she became disabled by her occupational disease, and the statutory date of injury, and the reduced average weekly wages she has since been able to earn as a pheresis nurse from December 12, 1989, until July 1993 and as a per diem nurse doing medical histories and other administrative duties since July 1993. This shall continue thereafter so long as she remains partially disabled, subject to a change of condition, medical or employment; provided, however, the same partial disability benefits are payable for a maximum of 300 weeks from the date of plaintiff s injury on December 12, 1989. However, the specific amounts of compensation plaintiff is due for her resulting partial incapacity since December 12, 1989, cannot be determined in the absence of both a wage chart indicating her earnings as a staff nurse prior to December 12, 1989, and her subsequent earnings as a pheresis nurse and nurse doing medical histories and other administrative duties since December 12, 1989. N.C. Gen. Stat. § 97-30.
6. Although the liver is undisputably an important internal organ for which compensation is payable pursuant to the provisions of N.C. Gen. Stat. § 97-31(24) and plaintiff remains at risk of developing chronic liver disease, there is no evidence that plaintiff, at this time, has suffered any type of permanent liver injury entitling her to an additional award of compensation pursuant to the provisions of N.C. Gen. Stat. § 97-31(24).
7. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from, and/or lessen the period of disability associated therewith, defendant-employer is obligated to pay all reasonable and necessary medical expenses incurred by plaintiff as a result of the occupational disease giving rise hereto. This shall include regular monitoring of plaintiff's condition to insure that she does not develop chronic liver disease or other problems associated with her disabling hepatitis C, as well as any necessary medical treatment for them.
 ***********
Based on the foregoing Findings of Fact and Conclusions of Law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant-employer shall pay plaintiff, on account of her partial disability, compensation at the lawful rate from December 12, 1989, to the scheduled hearing date and thereafter continuing at the same rate so long as she remains partially disabled, subject to a change of condition, medical or employment. These benefits are payable for a maximum of 300 weeks from the date of injury and should be based on two-thirds of the difference between the average weekly wage plaintiff was able to earn as a staff nurse at the time of her injury and the reduced average weekly wage she has since been able to earn as a pheresis nurse and nurse doing medical histories and administrative work. However, the specific amounts of compensation that plaintiff is due since December 12, 1989, for her resulting partial disability cannot be determined in the absence of both a wage chart indicating her earnings as a staff nurse in the bloodmobile during the year prior to December 12, 1989, and the amounts that she has been able to earn since. Such compensation having accrued, the same shall be paid in a lump sum, without commutation, subject to a reasonable attorney fee hereinafter approved.
2. A reasonable attorney fee in the amount of 25 percent of the compensation benefits due under the above Award is hereby approved for plaintiff's counsel, which shall be deducted from the same Award and forwarded directly thereto.
3. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from, and/or lessen the period of disability associated therewith, defendant-employer shall pay all reasonable and necessary medical expenses incurred by plaintiff as a result of the occupational disease giving rise hereto. This shall include regular monitoring of plaintiff's condition to insure that she does not develop chronic liver disease or other problems associated with her hepatitis C, as well as any necessary treatment for them, when bills for the same are submitted in accordance with the Industrial Commission rules.
4. Defendant-employer shall bear the costs.
 *********** ORDER
Unless the parties sooner agree to the amount of compensation to which plaintiff is entitled, it is hereby ORDERED that defendant-employer shall have 30 days to provide the undersigned with not only a wage chart indicating plaintiff's earnings as a staff nurse on its bloodmobile for the year prior to December 12, 1989, but records of plaintiff's earnings as a pheresis nurse and a per diem nurse doing medical histories and other administrative duties for a period of 300 weeks following December 12, 1989. Because of the potential that defendant-employer may not still have the necessary records available, to the extent that plaintiff has any documentary records of her earnings for either of these periods, such as tax returns or W-2 statements, she shall provide it to the undersigned within the same 30 day period.
This ___ day of July 1998.
 S/ ________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER